**Joseph E. TAYLOR, Plaintiff,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Defendant.**

**Civil Action No. 93–891 SSH.**

United States District Court, District of Columbia.

April 2, 1996.

**668**

Douglas B. Huron, Richard A. Salzman, Kator, Scott & Heller, Washington, DC, for Plaintiff.

Bruce P. Heppen, Assist. General Counsel, WMATA, Washington, DC, for Defendant.

## OPINION

STANLEY S. HARRIS, District Judge.

Before the Court are defendant's motion to dismiss or for summary judgment, plaintiff's opposition, and defendant's reply. Also before the Court are defendant's motion to

1. The ATP monitors the distance between trains and applies the brakes if two trains are too close

strike, plaintiff's opposition, and defendant's reply. Upon careful consideration of the entire record, defendant's motion for summary judgment is granted in part and denied in part. Defendant's motion to strike is granted. "Findings of fact and conclusions of law are unnecessary in motions under Rule 12 or 56." Fed.R.Civ.P. 52(a). However, for the benefit of the parties, the Court nonetheless sets forth its analysis.

*Background Facts*

The following facts were taken from plaintiff's complaint and the parties' briefing on defendant's dispositive motion. Plaintiff is an employee of defendant Washington Metropolitan Area Transit Authority (WMATA); he has worked for WMATA and its predecessor transit companies since 1958. In 1976, after plaintiff transferred to WMATA's newly-created Metrorail Department (the "Rail Department"), he was promoted to Assistant Superintendent of Central Control in the Rail Department. He was promoted to Superintendent of Central Control in 1978 and remained in that position until 1986. Thereafter, until August 1992, plaintiff remained a Superintendent but had various duties and assignments. As a Superintendent, plaintiff reported directly to the General Superintendent for Rail Transportation (RTRA), who in turn reported to the Assistant General Manager (AGM) for Rail Support (RAIL). Plaintiff's General Superintendent for the relevant time period was Aubrey Burton; Fady Bassily has occupied the AGM RAIL position since 1984.

In 1986, an incident occurred which has some relevance to this case. Plaintiff was apparently instructed by Bassily to tell train operators that, if a particular train safety mechanism (the "ATP") was malfunctioning, the operator could disconnect the ATP and continue to operate trains with passengers aboard until it reached the end of the line, at which point the train would be serviced.[1] Bassily's instruction was apparently in contravention of WMATA's safety rules, which prescribe that if the ATP is malfunctioning,

together.

passengers are to be evacuated from the train at the next stop. Plaintiff apparently orally instructed his subordinates that, if they wished to follow Bassily's instructions, they should seek clearance from another supervisor. Plaintiff then reported the matter to WMATA's General Superintendent of Safety, who investigated the incident and issued a report critical of Bassily's instruction.

From 1986 to 1991, plaintiff remained in a Superintendent's position but was reassigned several times to various locations. In March 1991, plaintiff was reassigned to a newly-created position, that of Superintendent for Rail Transportation Operations Support (also referred to as "RTRA Disciplinarian" by the parties). Plaintiff was then salaried at a TA–22 pay grade. In September 1991, plaintiff received a position description showing that his current position was salaried at a TA–24 grade, a higher grade than his then-current status.

On October 16, 1991, plaintiff was informed by his direct supervisor, Burton, that he was ineligible to receive an upgrade from TA–22 to TA–24. On November 6, 1991, plaintiff wrote to Burton asking for an explanation, and noting that one other Superintendent whose work plaintiff felt to be unsatisfactory had been upgraded to a TA–24. Burton apparently responded to plaintiff's letter, but plaintiff did not then pursue the issue of an upgrade.

In March 1992, plaintiff received his yearly performance evaluation. Plaintiff was evaluated as "Superior" in one category, "Above Satisfactory" in three others, and "Satisfactory" in the remaining ten categories. While plaintiff accepted his evaluation, he noted the following above his signature: ". . . [T]he job description indicates a TA–24. Why must I remain at a TA–22." Def.'s Mot. for Summ. J., Ex. 14.

On May 26, 1992, Burton responded to plaintiff's question, stating in a letter to plaintiff that the position plaintiff currently occupied, that of RTRA Disciplinarian, was "not [a position] that would necessarily support an upgrade to TA–24." Def.'s Mot. for Summ. J., Ex. 8. Burton therefore informed plaintiff that he would be reassigned to a Line Superintendent position, where the TA–24 upgrade was available, and that plaintiff would be evaluated every six months for two years. Burton also informed plaintiff that he would be upgraded if he achieved an "Above Satisfactory" overall rating on his yearly performance evaluation (meaning that plaintiff would have to receive at least eight "Above Satisfactory" marks out of 15 individual categories). Burton concluded the letter by noting that "any future re-occurrence [sic] of any of the type of unsatisfactory performance indicated above, will result in your demotion . . . or termination. . . ." Def.'s Mot. for Summ. J., Ex. 8.

On May 31, 1992, plaintiff filed an internal grievance protesting Burton's actions. In the grievance, plaintiff asserted that "because of my age and longevity, the Assistant General Manager [Bassily] constantly threatens me."[2] Pl.'s Opp., Ex. 15. Bassily denied plaintiff's grievance in July 1992, and on August 4, 1992, WMATA denied plaintiff's request that it review the matter.

On June 12, 1992, after plaintiff had filed his grievance but before Bassily denied it, Robert Gholston and Rita Davis, also WMATA employees, visited plaintiff in his office. The parties agree that Gholston asked plaintiff if he would be attending the WMATA picnic, and that plaintiff answered vehemently in the negative. Defendant asserts that plaintiff followed up his initial remark with a string of invectives directed toward Bassily, and more specifically, toward Bassily's ethnic origin. Plaintiff asserts he said nothing of the sort.

Gholston and Davis thereafter submitted separate letters to Bassily detailing what they remembered of the exchange. Bassily convened a panel of three individuals, among them the head of WMATA's Office of Labor Relations, to investigate the incident, and after interviewing only Gholston and Davis,

---

**2.** Plaintiff was the oldest Superintendent in the Rail Division in 1992; he was then 57 years old. Leroy Walker and Allen Brown, two other Superintendents in the Division cited by plaintiff as younger Superintendents that received more favorable treatment, were 50 and 53 years old respectively in 1992.

the panel submitted to Bassily that it believed their letters to be accurate. The panel stated in its submission that plaintiff had committed a "Category 2 offense," which, under the WMATA personnel manual guidelines, warrants a number of disciplinary actions, up to and including dismissal.

On August 10, 1992, plaintiff was informed in a memorandum from Burton that he had violated WMATA's Civil Rights Policy by "prefacing a reference to [Bassily's] race with expletives." Def.'s Answer at 4; Pl.'s Opp., Ex. 21. Plaintiff was given three choices: immediate resignation, immediate retirement, or demotion to Train Operator or Station Manager. (A demotion from Superintendent to Station Manager carries with it an approximately $30,000 drop in pay.) Plaintiff was given three days to make his choice. On August 13, 1992, plaintiff met with Burton and Bassily, told Bassily he had not made the statement attributed to him, and asked Bassily to rescind the penalty. Bassily declined to completely rescind the penalty, but offered to reinstate plaintiff as a TS–05, which would have entailed a much less severe salary cut of approximately $7,500 a year. Plaintiff refused to accept the reassignment, because it apparently meant that he would have no seniority in bidding on assignments. After the meeting with Burton and Bassily concluded, plaintiff signed a memorandum accepting his demotion, but noting that the acceptance was involuntary. On August 16, 1992, plaintiff was demoted to the position of Station Manager.

On August 20, 1992, plaintiff filed a grievance with Burton, asserting, *inter alia*, that neither plaintiff nor his secretary had been interviewed by the investigative panel prior to its recommendation to Bassily. (Plaintiffs secretary, Carol DeShazo, has stated that she did not hear plaintiff make any inflammatory comments about Bassily.) Burton denied plaintiff's grievance on August 28, 1992, and on September 2, plaintiff appealed the denial to Bassily. Bassily denied plaintiff's second-level grievance, but again indicated that he was willing to place plaintiff in

a first-line supervisory position, an upgrade from Station Manager which would "considerably reduce the financial burden" plaintiff was experiencing as a result of the demotion. Pl.'s Opp., Ex. 7, p. 6. Plaintiff did not accept Bassily's offer, apparently because he felt it would have been an admission of guilt. *See* Pl.'s Opp., Ex. 22.

Plaintiff continued pursuing his internal grievance to the highest level possible. LeRoy Bailey, plaintiff's grievance reviewer at the fourth level of internal review, "questioned" certain actions taken by plaintiff's supervisors, including the fact that neither plaintiff nor his secretary was interviewed by the panel convened to investigate the June 12 incident. Pl.'s Opp., Ex. 22. However, Bailey noted in closing that after his independent review of all the records and statements made thus far, "it appears that Mr. Taylor's discipline was justified and that no mitigation would be acceptable to him," and Bailey denied plaintiff's grievance. *Id.* Plaintiff's internal grievance was conclusively denied in October 1992.

On November 17, 1992, plaintiff filed a charge of age discrimination and retaliation with the EEOC against WMATA and Bassily. (Bassily was initially named as a defendant in this action; he was voluntarily dismissed from the case on August 24, 1993). Plaintiff filed his complaint in this case on April 30, 1993.[3] Plaintiff's complaint contains three counts. Count One alleges that WMATA discriminated against him on the basis of his age when it refused to upgrade him to a TA–24 level position, and also when it demoted him to a Station Manager position. In addition, Count One alleges that WMATA retaliated against him for having filed an internal grievance alleging age discrimination when it demoted him to Station Manager. Count Two alleges that WMATA breached its contract of employment with plaintiff when it determined to discipline plaintiff without first affording him an opportunity to contest the finding of violation. Count Three states that WMATA committed the tort of "wrongful demotion."

3. On June 24, 1994, the EEOC issued a determination finding no discrimination or retaliation and dismissing plaintiff's charge.

*Analysis*

Summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a summary judgment motion, all evidence and the inferences to be drawn from it must be considered in a light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The inferences, however, must be reasonable; a nonmoving party can only defeat a motion for summary judgment by responding with some factual showing to create a genuine issue of material fact. *Harding v. Gray*, 9 F.3d 150, 154 (D.C.Cir. 1993). Summary judgment cannot be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Plaintiff has not made out a *prima facie* case of age discrimination with respect to WMATA's refusal to upgrade plaintiff. The Court therefore grants summary judgment as to this portion of Count I of plaintiff's complaint. However, the Court finds that genuine issues of material fact exist as to plaintiff's age discrimination claim arising from his demotion and plaintiff's retaliation allegation, and the Court accordingly denies summary judgment on these portions of Count I. Plaintiff has not submitted any relevant evidence to support his contention that the WMATA personnel manual constituted an employment contract, and the Court therefore grants defendant's motion for summary judgment on Count Two. Finally, since no cause of action for wrongful demotion exists in the District of Columbia outside a very narrow exception inapplicable in this case, Count Three is dismissed.

## A. Plaintiff's Count I ADEA Claims

### 1. WMATA's Refusal To Upgrade

 Disparate treatment suits brought under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* (1988 & Supp.1995), are analyzed under the same framework used in cases of race or gender discrimination arising under Title VII of the Civil Rights Act of 1964. *Arnold v. United States Postal Service*, 863 F.2d 994, 996 (D.C.Cir.1988). The now-familiar *McDonnell Douglas* burden-shifting analysis used in Title VII cases applies to ADEA claims as well: to succeed on a claim of age discrimination, a plaintiff must first establish a *prima facie* case of age discrimination. The burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action taken against the plaintiff-employee. The burden then shifts again to plaintiff, who must establish by a preponderance of the evidence that the employer's stated reasons were pretextual and that age was a determining factor in the employment decision. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973); *Hayman v. Nat'l Academy of Sciences*, 23 F.3d 535, 538 (D.C.Cir. 1994); *Csicseri v. Bowsher*, 862 F.Supp. 547, 568 (D.D.C.1994), *aff'd without opinion*, 67 F.3d 972 (D.C.Cir.1995).[4]

 To make out a *prima facie* case of age discrimination, a plaintiff first must demonstrate "facts sufficient to create a reasonable inference that age discrimination was 'a determining factor' in the employment decision." *Cuddy v. Carmen*, 694 F.2d 853, 856–57 (D.C.Cir.1982) (footnote omitted). A plaintiff can make out a *prima facie* case if he shows that: (1) he belongs to the statutorily protected group (between the ages of forty and seventy); (2) he was qualified for the position; (3) he was not awarded the position; and (4) he was disadvantaged in favor of a younger person. *Coburn v. Pan*

---

**4.** In *Saint Mary's Honor Center v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993), the Supreme Court clarified that, although the *McDonnell Douglas* presumption shifts the burden of production to defendant to articulate a nondiscriminatory reason for its adverse treatment of plaintiff, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."

*American World Airways, Inc.,* 711 F.2d 339 (D.C.Cir.1983) (citing *Cuddy,* 694 F.2d at 857); *Hayman,* 23 F.3d 535, 537.

■ While plaintiff, who is now 61, falls within the protected age group, and while he can show that he was not awarded the upgrade to TA–24 which he sought, he cannot satisfy the second prong of the four requirements, because he cannot show that he was qualified for the upgrade. To qualify for the TA–24 upgrade, plaintiff needed to receive an "Above Satisfactory" rating on at least eight of fifteen individual categories in his performance evaluation. Plaintiff received three "Above Satisfactory" markings and one "Superior" marking in the performance evaluation in question, which was insufficient to warrant the upgrade. Plaintiff therefore cannot satisfy the requirements for a *prima facie* case of age discrimination with respect to WMATA's failure to upgrade him from a TA–22 Superintendent to a TA–24 Superintendent.

Plaintiff contends that it was the scope (or lack of scope) of his duties in the RTRA Disciplinarian position that prevented him from achieving the marks necessary for an upgrade, and that WMATA purposely placed him in the position to prevent him from obtaining the upgrade. WMATA apparently recognized that the RTRA Disciplinarian position did not present as likely an opportunity for advancement to the TA–24 level: Aubrey Burton informed plaintiff in his May 26, 1992, letter that, since the position plaintiff then held was "not one that would necessarily support an upgrade to TA–24," plaintiff would be reassigned to a Line Superintendent position where the upgrade was available and would be evaluated every six months. Plaintiff would have the Court speculate that this entire process—the placement of plaintiff in the RTRA Disciplinarian position, the (as yet unattributed) decision to make a TA–24 grade available to those Superintendents who averaged "Above Satisfactory" ratings on their evaluations, the fact

that the RTRA Disciplinarian position apparently did not present the opportunity for such ratings, and the ensuing transfer of plaintiff to a position where he *was* eligible for those ratings—was part of a convoluted conspiracy to discriminate against plaintiff because of his age. Plaintiff has shown not a shred of evidence to support these multiple leaps of logic, and the Court will not go that route.

2. *WMATA's Demotion of Plaintiff to Station Manager*

■ Plaintiff can make out a *prima facie* case of age discrimination with respect to his demotion. Plaintiff was 57 when he was demoted to Station Manager, he was qualified for the Superintendent-level job he had held for many years, he was demoted, and other Superintendents younger than he were not demoted. The burden of production, therefore, shifts to defendant to articulate a legitimate, nondiscriminatory reason for plaintiff's demotion.

■ The reason is clear: plaintiff was found by a neutral investigative panel composed, among others, of the head of WMATA's Office of Labor Relations, to have committed a major breach of WMATA's rules of conduct by referring to his AGM's national origin in an expletive-laden outburst in front of two other WMATA employees.[5] Since defendant has produced a nondiscriminatory reason for plaintiff's demotion, the burden shifts back to plaintiff to show pretext, and this burden "now merges with the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination." *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *see also Hazen Paper Co. v. Biggins,* 507 U.S. 604, 609–11, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993) (a disparate treatment claim under the ADEA "cannot succeed unless the employee's [age] actually played a role in that pro-

5. Plaintiff again contends, as with WMATA's failure to upgrade him, that the events preceding and following the panel's finding were part of a conspiracy. Plaintiff suggests that his supervisors convinced two neutral WMATA employees who observed the events of June 12, 1992, the

head of WMATA's Labor Relations Department, and two other members of an investigative panel, essentially to create a wholesale falsehood, all in order to remove plaintiff from his position. Again, the Court will not engage in this level of speculation.

cess and had a determinative influence on the outcome").

Plaintiff has submitted evidence that other, younger employees, though perhaps not at the Superintendent level, were found to have committed like (or more egregious) violations of the WMATA rules of conduct and were not demoted to a significantly lower-level position, but instead were either counseled by supervisors, reprimanded, or suspended for a short period of time. *See* Pl.'s Opp., Exs. 29–32. A genuine issue of fact therefore exists as to whether the decision to demote plaintiff to a significantly lower-salaried position was motivated because of his age, or merely (as defendant suggests) because plaintiff, as a Superintendent, quite properly should be held to a higher standard of conduct than lower-level employees and therefore was dealt with more harshly. Because the Court finds that a genuine issue of material fact exists as to pretext, defendant's motion for summary judgment as to this portion of Count I of plaintiff's complaint is denied.

**B.** *Plaintiff's Count I Retaliation Claim*

The Court likewise finds that a genuine issue of material fact exists as to plaintiff's Count I retaliation claim. The ADEA makes it unlawful

> for an employer to discriminate against any of his employees ... because such individual ... has opposed any practice made unlawful by this section, or because such individual ... has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

29 U.S.C. § 623(d) (1988). This provision parallels the anti-retaliation provision contained in Title VII, *see* 42 U.S.C. § 2000e–3(a) (1988), and cases interpreting the latter are frequently relied upon in interpreting its ADEA counterpart. *Passer v. American Chemical Soc.,* 935 F.2d 322, 330 (D.C.Cir. 1991).

To establish a *prima facie* case of retaliation, a plaintiff must show: "(1) that he or she engaged in activity protected by the statute; (2) that the employer ... en-

gaged in conduct having an adverse impact on the plaintiff; and (3) that the adverse action was causally related to the plaintiff's exercise of protected rights." *Passer,* 935 F.2d at 331 (citations omitted). Plaintiff engaged in activity protected by the ADEA when he filed an internal grievance alleging that one of his supervisors was threatening him "because of [his] age and longevity." Pl.'s Opp., Ex. 15. The employer engaged in conduct having an adverse impact on plaintiff when it demoted him to a Station Manager position.

Finally, plaintiff was demoted by Fady Bassily less than a month after Bassily denied his internal grievance. "The causal connection component of the prima facie case may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity." *Wiggins v. Philip Morris, Inc.,* 853 F.Supp. 470, 474 n. 7 (D.D.C.1994) (quoting *Mitchell v. Baldrige,* 759 F.2d 80, 86 (D.C.Cir.1985)). At this stage in the litigation, and at this stage in the analysis of plaintiff's retaliation claim, plaintiff is entitled to the inference that a causal connection (however tenuous) existed between plaintiff's internal grievance and his subsequent demotion.

Since plaintiff has put forth a *prima facie* case of retaliation, the burden shifts to defendant to articulate a nondiscriminatory reason for its actions against plaintiff. *Mitchell,* 759 F.2d at 87. As stated above, defendant can clearly do so: it found plaintiff to have committed a serious violation of its rules of conduct. But also as stated above, plaintiff has submitted evidence which, if credited by the finder of fact at trial, indicates that other, younger employees who had committed similar violations were not dealt with as harshly. Accordingly, defendant's motion for summary judgment on plaintiff's claim of retaliatory demotion is denied.

**C.** *Plaintiff's Breach of Contract Claim*

Plaintiff claims in Count Two that WMATA breached his contractual rights when it

674

demoted plaintiff without interviewing him about the events of June 12. To support this claim, plaintiff argues that the WMATA Personnel Policies and Procedures Manual ("Manual") constitutes a contract of employment between WMATA and himself. Section 7.9(H) of the Manual provides that an employee who is alleged to have committed a Category 2 offense (the level of offense plaintiff was charged with having committed) "shall be given an opportunity to respond to the allegations before further action is taken." Since plaintiff was given a memorandum informing him that he had violated WMATA's rules of conduct prior to being given an opportunity to contest the allegations against him, plaintiff contends that WMATA breached its contract created between plaintiff and WMATA by virtue of the Manual. Plaintiff is in error.

■■■ Plaintiff is an "at-will" employee of WMATA and, as such, does not have an employment contract with the agency.

There is a presumption that a hiring not accompanied by an expression of a specific term of duration creates an employment relationship terminable at will by either party at any time. This presumption can be rebutted by evidence that the parties intended the employment to be for a fixed period, or subject to specific preconditions before termination.

*Perkins v. District Gov't Employees Fed. Credit Union,* 653 A.2d 842, 842 (D.C.1995) (quoting *Nickens v. Labor Agency of Metropolitan Washington,* 600 A.2d 813, 816 (D.C. 1991)). To rebut the presumption of an at-will employment relationship, the parties

must "state clearly their intention" to limit the employer's right to terminate. *Id; Littell v. Evening Star Newspaper Co.,* 120 F.2d 36, 37 (U.S.App.D.C.1941); *Minihan v. American Pharmaceutical Ass'n,* 812 F.2d 726, 728 (D.C.Cir.1987) (applying *Littell*'s requirement of a "clear statement" in sustaining grant of summary judgment). The existence of a personnel manual, in and of itself, does not convert an employee's status from at-will to "permanent." *See Minihan,* 812 F.2d at 728. Rather, plaintiff must point to specific statements in the Manual that clearly reflect the parties' intent to transform the employment relationship from at-will to permanent. Plaintiff has failed to point to any such statements of intent.[6]

■■■ Plaintiff contends that whether the Manual created a contract of employment is a factual issue that must be determined by a jury. Plaintiff is incorrect; where, as here, plaintiff has pointed to nothing in the Manual that evinces an intent to create an employment contract for a fixed period of time, summary judgment is appropriate. *See Perkins,* 653 A.2d at 843 (upholding grant of summary judgment on grounds that, as a matter of law, employment relationship was terminable at will). The Court finds that plaintiff's employment was an at-will employment relationship and therefore dismisses plaintiff's breach of contract claim.[7]

## D. *Plaintiff's Wrongful Demotion Claim*

As an alternative to his age discrimination and retaliation claims, plaintiff alleges in Count Three that, beginning in 1986, WMATA

6. Plaintiff's reference to the "mandatory" language of the Manual governing the procedures by which an employee is disciplined is insufficient to create a genuine issue of fact as to whether the Manual was a contract, since that language does not state, clearly or otherwise, the intent of WMATA and its employees to bind themselves to something other than an at-will contract. In addition, the Court notes that the Manual could be altered unilaterally and without prior notice, and that copies of the Manual were not automatically made available to employees (although plaintiff possessed a copy in his capacity as a Superintendent), both of which facts cut against any finding that the Manual's provisions created an employment contract between WMATA and plaintiff.

7. In addition, even if the Manual could be found to constitute an employment contract, the Court finds that WMATA did not violate the relevant terms of the Manual, since plaintiff was afforded an opportunity to present his version of the June 12 events prior to Bassily's acting on his demotion. While the Court is somewhat troubled by Bassily's failure to ensure that plaintiff and his secretary were interviewed by the investigative panel prior to its issuing a report on plaintiff's Category 2 violation, Bassily offered plaintiff the opportunity to present his side of the incident— and even offered to mitigate the discipline, an offer which plaintiff inexplicably refused—prior to the demotion's taking effect.

undertook a campaign against plaintiff that was characterized by multiple reassignments, a refusal to promote plaintiff to TA–24, and ultimately his demotion to Station Manager ... all because plaintiff refused to follow [the 1986] directives by [ ] Bassily that would have resulted in violation of the Metrorail Safety Rules and instead reported Bassily's directives to the Superintendent of Safety....

Pl.'s Compl. at 7. Plaintiff contends that defendant violated his "right to be free from severe personnel actions for refusing to violate the law," *id.* at 8, and claims WMATA committed the tort of wrongful demotion.

 Under District of Columbia law, "an employer may discharge an at-will employee at any time and for any reason, or for no reason at all." *Adams v. George W. Cochran & Co., Inc.,* 597 A.2d 28 (D.C.App.1991). One narrow public policy exception to this principle exists: if an employee is put to the choice between violating the law and being terminated from employment, a cause of action sounding in tort for wrongful discharge arises if the employee is fired for refusing to violate the law. *Adams,* 597 A.2d at 33.[8]

 Plaintiff's situation is not such a circumstance. Plaintiff was not told to violate the law or suffer the consequences. Rather, when Bassily directed plaintiff to tell his subordinates to act in a manner which appeared to contravene the WMATA Safety Manual, plaintiff apparently orally informed his subordinates that they should seek permission from his supervisors if they wished to cooperate with Bassily's instructions, and then plaintiff informed the Safety Office, which conducted an investigation of Bassily's errant directive. This scenario is not an *Adams* case. It is quite similar, however, to a "whistleblower" case, where an employee reports allegedly unlawful actions to a superior and then suffers an adverse action be-

cause of his report. Such a case does not fall within the *Adams* exception. *See Gray v. Citizens Bank of Washington,* 602 A.2d 1096, 1097 (D.C.1992) (at-will employee could not recover from former employer for wrongful discharge for reporting to employer illegal activities by fellow employee); *Elliott v. Healthcare Corp.,* 629 A.2d 6, 8–9 (D.C.1993) (discharged employee did not have cause of action for "abusive discharge" against former employer, where employee alleged that he was fired for reporting maintenance deficiencies to his managers). Accordingly, plaintiff's claim of wrongful demotion fails and Count Three is dismissed.

## E. *Defendant's Motion To Strike*

In addition to its motion to dismiss or for summary judgment, defendant filed a motion to strike certain references in plaintiff's opposition to its motion, and to strike a filing submitted after briefing on the merits was complete. Plaintiff made reference in his opposition to defendant's motion to two cases, *Townsend v. WMATA,* 746 F.Supp. 178 (D.D.C.1990) and *Jones v. WMATA,* Civil Action No. 89–552 (D.D.C. August 6, 1993) where individual defendants, some of whom were involved in actions at issue in this case, were found to be liable for sexual harassment, retaliation, or other forms of discrimination. Additionally, plaintiff filed a supplement after briefing on defendant's dispositive motion was complete, noting that a jury had returned a verdict against WMATA in the remaining counts of *Jones.*

 While the fact of the existence of another case may admissible, *but see* Fed. R.Evid. 403, any findings of fact issued from those cases are hearsay. *See United States v. Jones,* 29 F.3d 1549, 1554 (11th Cir.1994) ("a court may take notice of another court's order only for the limited purpose of recognizing the 'judicial act' that the order repre-

---

8. As defendant points out, no case has extended the narrow *Adams* exception beyond the case where a plaintiff is terminated for his refusal to comply with unlawful orders. *Adams* itself states that the "very narrow exception to the at-will doctrine under which a discharged at-will employee may sue ... for wrongful discharge" occurs when "the sole reason for the discharge is the employee's refusal to violate the law, as ex-

pressed in a statute or municipal regulation." 597 A.2d at 34. For the purposes of this Opinion, the Court will assume without deciding that the narrow *Adams* exception is available for other, lesser forms of adverse personnel action. In addition, the Court will assume (although it seriously doubts) that the WMATA safety rules constitute "municipal regulations."

sents or the subject matter of the litigation"); *see also Nipper v. Snipes,* 7 F.3d 415, 418 (4th Cir.1993). While the Court may take note that WMATA was or is a defendant in other discrimination or retaliation cases, the Court cannot transpose the factual findings of another judge or jury into the framework of this case. Defendant's motion to strike therefore is granted.

### F. *Conclusion*

Accordingly, defendant's motion for summary judgment on Count One is granted in part and denied in part, defendant's motion for summary judgment on Count Two is granted, and defendant's motion to dismiss Count Three likewise is granted. An appropriate Order accompanies this Opinion.

### *ORDER*

For the reasons stated in the accompanying Opinion, it hereby is

ORDERED, that defendant's motion for summary judgment on Count One is granted in part and denied in part. It hereby further is

ORDERED, that defendant's motion for summary judgment on Count Two is granted. It hereby further is

ORDERED, that defendant's motion to dismiss Count Three is granted. It hereby further is

ORDERED, that defendant's motion to strike references in plaintiff's opposition (and defendant's reply) to *Jones v. WMATA,* Civil Action No. 89–552 (August 6, 1993), and *Townsend v. WMATA,* 746 F.Supp. 178 (D.D.C.1991), and to strike a supplemental filing referencing *Jones,* is granted. All references to the cases in the briefs and associated filings are struck, and plaintiff's Notice to the Court regarding the jury verdict in *Jones* is struck.

SO ORDERED.